J-A15041-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF: K.K.T., A MINOR | : IN THE SUPERIOR COURT OF |
| | :       PENNSYLVANIA |
| | : |
| APPEAL OF: D.H., MOTHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 181 MDA 2026 |

Appeal from the Decree Entered December 29, 2025
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  116-ad-2025

| | |
|---|---|
| IN THE MATTER OF: L.W., A MINOR | : IN THE SUPERIOR COURT OF |
| | :       PENNSYLVANIA |
| | : |
| APPEAL OF: D.H., MOTHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 182 MDA 2026 |

Appeal from the Decree Entered December 29, 2025
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  117-AD-2025

BEFORE:   KUNSELMAN, J., LANE, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED: AUGUST 13, 2026**

D.H. ("Mother") appeals[1] from the decrees entered December 29, 2025,

which granted the petitions of Dauphin County Social Services for Children

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] This Court consolidated Mother's appeals *sua sponte* on February 13, 2026. *See* Pa.R.A.P. 513.

and Youth (the "Agency") and involuntarily terminated her parental rights to her children K.K.T. (born 3/2025), and L.W. (born 4/2023) (together, "Children").[2]  Mother's appellate counsel, Lisa M. Watson, Esquire, has filed a petition to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *Commonwealth v. McClendon*, 434 A.2d 1185 (Pa. 1981).[3]  We grant Mother's counsel's petition to withdraw and affirm.

The trial court accurately set forth the factual and procedural history of this case as follows:

> [The Agency alleged in its petition for termination of Mother's rights to Children that the Agency] has a history with Mother dating back to 2020.  Relevant to the instant matter, subject child L.W. was born [in April] 2023.  On November 7, 2023, the Agency received a referral with concerns related to Mother's paramour and [K.K.T.'s Father], [J.T.], who allegedly threatened to punch L.W.'s one-year-old sister[4] (not a subject of the instant case) in the face.
>
> Subsequently, on January 10, 2024, the Agency received a Child Protective Services ([] "CPS") referral with concerns that L.W.'s sister was seen with linear bruising on her face.  On January 23, 2024, an Agency caseworker completed a visit to Mother's home, and Mother denied that [J.T.] lived in the home.  While no children

---

[2] The court also terminated each child's respective biological father's rights.

[3] *See In re V.E.*, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending *Anders* briefing requirements to termination of parental rights appeals involving parents represented by court-appointed counsel); *In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014) (same).

[4] The record reflects that Mother has seven children, all of whom have been removed from her care.  *See* Petition for Involuntary Termination of K.K.T., 10/17/25, at ¶ 10.  Nevertheless, only Mother's parental rights to K.K.T. and L.W. are at issue in these consolidated appeals.

were home when the caseworker initially visited, Mother informed the caseworker that the children would be home later in the day[,] and the caseworker could return at that time.

Later that same day, however, the caseworker received a call from Mother who stated that she forgot to tell the caseworker that L.W. was going to New York with a godparent and would[,] in fact[,] not be home when the caseworker returned later that day. Nonetheless, the caseworker returned to Mother's home later that day, at which time [J.T.] answered the door. When asked about the bruising on the face of L.W.'s sister, Mother claimed that L.W. had caused the bruising when he threw a toy at his sister's face and denied that [J.T.] served in a caregiving role. Mother also reiterated that L.W. was in New York with family but could not provide an address or phone number for the location where L.W. was staying. Mother stated that L.W. would return to her home on January 26, 2024.

On January 26, 2024, the Agency caseworker attempted to revisit Mother's home, but Mother was not home. The caseworker was able to telephone Mother, who explained that L.W. was currently in the upstairs neighbor's home. The caseworker met with L.W. and observed healed bruising on L.W.'s face, head, and neck. When the caseworker spoke with Mother on the phone about the bruising, Mother admitted that the bruising had occurred while under [J.T.'s] care and that she had attempted to hide L.W. from the caseworker due to the bruising. Mother also admitted that she failed to take L.W. for medical care when she became aware of his injuries.

Since the family was unable to provide a satisfactory explanation for L.W.'s bruising and because Mother would not agree to a safety plan proposed by the Agency, the court signed a pick-up order placing L.W. and his sister in Agency custody on January 26, 2024. On that same date, L.W. was evaluated at Hershey Medical Center and was found to have a skull fracture and various healing bruises consistent with child abuse. In connection with L.W.'s injuries, Mother was charged with endangering the welfare of children [("EWOC")] and obstruction of the administration of law. [J.T.] was charged with two counts of aggravated assault and one count of [EWOC].

On January 29, 2024, following a shelter care hearing, which was attended by Mother, the court ordered that L.W. remain in temporary care and custody of the Agency pending an

adjudication and disposition hearing. The court further ordered that Mother's visits with L.W. be supervised and could only take place after Mother tested negative for all non-prescribed substances.

On February 7, 2024, following an adjudication and disposition hearing, which was attended by Mother, L.W. was adjudicated dependent and placed in the care and custody of the Agency. On July 1, 2024, the Agency caseworker received information that Mother had been evicted from her home, and on July 3, 2024, Mother provided the Agency with a new address.

On February 20, 2025, the Agency visited Mother's home. The home was in disarray with no walking spaces, clothing strewn throughout the home, ripped paper on the floor, litter boxes made of cardboard, and no access to the downstairs.

[In March 2025], Mother gave birth to subject child, [K.K.T.], who is L.W.'s half sibling. [. . . Around that time], the Agency received a phone call from Cumberland County Children and Youth Services, indicating that [] [the A]gency had received a referral due to Mother testing positive for buprenorphine at the time of [K.K.T.'s] birth. [T]he Agency received a pick-up order[,] placing [K.K.T.] into the care and custody of the Agency. [Also], the Agency completed a hospital visit with Mother and [K.K.T.], who was then two [] days old. When the Agency arrived at the hospital, Mother was in the lobby[,] upset and yelling at hospital staff. While in the hospital after his birth, [K.K.T.] experienced drug withdrawal symptoms.

[Several days later, K.K.T.] was discharged from the hospital and placed in a formal foster home. At that time, [K.K.T.'s] foster parents observed withdrawal symptoms and slight tremors. [Also], the Agency received the results of a drug test from [K.K.T.'s] umbilical cord, which tested positive for buprenorphine.

[In March 2025, after K.K.T.'s birth], the Agency conducted an announced visit to Mother's residence. Mother stated that [J.T.] was not currently living with her, but she could not provide a current address for him. The Agency observed that the housing conditions had improved from when they last visited her home in February.

[Also in March 2025], following an adjudication and disposition hearing[,] which was attended by Mother and [J.T.], [K.K.T.] was adjudicated dependent and ordered to remain in his current

placement. The court also found aggravated circumstances to exist for both Mother and [J.T.] due to the injuries sustained by L.W. and [J.T.'s] status as a registered Megan's Law offender.[5] As a result, the Agency was relieved of reasonable reunification efforts regarding Mother and [J.T.]

Four [] permanency review hearings were held on July 3, 2024[,] November 7, 2024[,] March 11, 2025[,] and July 8, 2025, respectively. At each hearing, the Children were found to be dependent and continued to be placed in Agency care and custody. Mother failed to attend the hearings except for the one held on March 11, 2025.

On June 12, 2025[,] and June 16, 2025, Mother was scheduled to meet at the Agency's office to sign paperwork, but she failed to appear on either date. [The last time Mother contacted the Agency was] July 2025.[6] As of the filing of the Agency's petition, Mother had missed more than nine [] scheduled visits with L.W. and had only attended two [] scheduled visits with [K.K.T.] At the permanency review hearing held on July 8, 2025, Mother's visits with the Children were reduced from one time once a week to one time every other week. On October 17, 2025, the [A]gency filed petitions for involuntary termination of parental rights regarding each of the subject Children[.]

Trial Court Opinion, 2/23/26, at 2-6 (unnecessary capitalization omitted).

On December 29, 2025, the court held an involuntary termination of parental rights hearing, at which Mother and Agency Caseworker Elizabeth Staub testified. At the hearing, the court appointed Gina M. Carnes, Esquire,

---

[5] The Sexual Offender Registration and Notification Act ("SORNA"), 42 Pa.C.S. §§ 9791-9799.9, replaced Megan's Law as of December 20, 2012. *See, e.g.*, ***Commonwealth v. Mucci***, 327 A.3d 1223, 1228 n.3 (Pa. Super. 2024).

[6] At the termination hearing, Agency Caseworker Elizabeth Staub testified that Mother spoke to her on the morning of the hearing and twice the week prior, but before that, she had not heard from Mother since July 2025. *See* N.T. Termination Hearing, 12/29/25, at 32.

to serve both as Children's legal counsel and their guardian *ad litem* ("GAL").[7]

*See* N.T. Hearing, 12/29/25, at 6.

At the termination hearing, Caseworker Staub first testified to how the Agency became involved in Children's cases. Specifically, in January 2024, following a CPS referral on L.W.'s sibling, the Agency discovered, during that

_____

[7] As a preliminary matter, we must first address Children's right to legal counsel and best interest counsel in the termination of parental rights proceeding. *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1224, 1235-36 (Pa. 2020) (holding that appellate courts must review *sua sponte* whether trial court appointed counsel to represent child's legal interests in contested termination proceedings and, in event that same attorney was appointed to represent child's best interests and legal interests, whether trial court determined there was no conflict between these interests prior to making appointment); *see also In re Adoption of A.C.M.*, 333 A.3d 704, 707-08 (Pa. Super. 2025).

Here, the court did not make a specific finding that no conflict existed. Yet, in our review of the record, there was no indication that Children were verbal, and we discern no conflict because the Children were nine months old and two years old at the time of the termination hearing, which ages satisfy the presumption that Children were too young to articulate a preference for the outcome of the proceedings such that no conflict could exist. *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (noting that if the preferred outcome of child is incapable of ascertainment because child is very young and pre-verbal, there can be no conflict between child's legal interests and best interests and finding no conflict where children were two and three years old where parties agreed no conflict existed); *see also In re Adoption of M.F.H.*, 346 A.3d 384, 2025 WL 2466989, at *2 n.5 (Pa. Super., filed Aug. 27, 2025) (unpublished memorandum cited for persuasive value pursuant to Pa.R.A.P. 126(b)) (applying *T.S.* presumption to two-year-old child); *In the Int. of A.B.*, 346 A.3d 330, 2025 WL 2233486, at *4 n.5 (Pa. Super., filed Aug. 4, 2025) (unpublished memorandum cited for persuasive value pursuant to Pa.R.A.P. 126(b)) (same); *cf. Interest of S.Y.*, 303 A.3d 760, 2023 WL 4590832, at *3 and n.3 (Pa. Super., filed July 18, 2023) (unpublished memorandum) (vacating and remanding where no indication in record whether conflict existed for two-year-old child).

investigation, that Mother attempted to hide L.W. from the Agency, falsely claiming L.W. was in Buffalo, New York. *See* N.T. Hearing, 12/29/25, at 8. When the Agency conducted a follow-up visit, it found that Mother had left L.W. in the care of J.T., a registered Megan's Law sex offender, and that L.W. had bruising to his arm, legs, and head.[8] *See id.* at 8-9. L.W. was given a verbal pickup order on January 26, 2024, and placed in the kinship foster care of his paternal grandfather, W.W. *See id.* at 9.

For K.K.T., Agency involvement began in February 2025, when a home visit revealed conditions unfit for a newborn, including that Mother had no supplies aside from a crib. *See id.* at 10. In March 2025, the Agency learned that Mother had given birth to K.K.T., without alerting the Agency, at a hospital over an hour away, and there were concerns that Mother was attempting to hide the child. *See id.* J.T. was also aggressive with hospital staff. *See id.* Both parents had pending EWOC and assault charges related to L.W.'s abuse at the time of K.K.T.'s birth. *See id.* A verbal pickup order was granted for K.K.T., who was placed in formal foster care. *See id.*

Next, Caseworker Staub outlined Mother's eleven service objectives for reunification as follows: (1) cooperate with the Agency; (2) complete a psychological evaluation with a parenting component and comply with all recommendations, which included that Mother participate in intensive

---

[8] The termination petition for L.W. stated that he was discovered with skull fracturing and his sibling was discovered simultaneously with rib fracturing. *See* Petition for Involuntary Termination of L.W., 10/17/25, at ¶¶ 18(k)-(l).

therapy, receive psychiatric consultation, participate in parenting classes and have her visits remain fully supervised, participate in victim awareness and domestic violence support groups, engage in Narcotics Anonymous ("NA") and Alcoholics Anonymous ("AA") meetings, and engage in prosocial activities; (3) complete an evidence-based parenting program; (4) maintain safe, stable, and sanitary housing; (5) maintain stable employment; (6) attend all court hearings, agency meetings, and treatment plan meetings; (7) cooperate with the pending CPS criminal investigation regarding L.W.; (8) resolve all criminal activity; (9) sign all releases for information requested by the Agency; (10) notify the Agency within twenty-four hours of inhabiting a new residence or acquiring new contact information; and (11) reimburse Dauphin County for the support of Children. **See id.** at 11-15.

As to each objective, Caseworker Staub described Mother's compliance therewith as follows: (1) overall, Mother was uncooperative with the Agency[9]; (2) Mother completed her psychological evaluation in May of 2024, but the Agency never received records or reports from any counseling or psychiatric treatment providers, and similarly never received records of attending domestic violence support groups, NA, or AA, as she was recommended to do; (3) Mother completed a parenting program through JusticeWorks in April of

_____

[9] Specifically, Caseworker Staub testified that Mother "has not been consistent with communication. She is often confrontational over the phone. She has also changed her story multiple times of what had happened with L.W.," N.T. Hearing, 12/29/25, at 11, and Mother "did not sign all of the service plans that were sent to her for her to complete and sign." **Id.** at 12.

2024; (4) Mother was inconsistent in her compliance with maintaining stable housing, especially where she never provided an address for where she lived from July 2025 through December of 2025, and further, that the Agency was unable to confirm Mother's stable housing thereafter[10]; (5) Mother recently stopped providing pay stubs to prove she has stable employment and refused to provide any going forward; (6) Mother failed to attend the majority of court hearings or Agency meetings; (7) Mother's charges in connection with L.W. remained pending; (8) Mother had active cases at the time of the hearing in Schuylkill County and York County and a warrant out for her arrest in York County; (9) Mother failed to sign all releases requested by the Agency, including a release for a provider showing Mother received counseling services, and failed for several months to sign vital records paperwork to permit the Agency to obtain L.W.'s birth certificate, which ultimately required the Agency to seek an order of court; (10) Mother failed to notify the Agency within twenty-four hours of either a change of address or change of phone number; and (11) there remained pending reimbursement due for K.K.T. **See id.** at 11-15.

As to Children's current placements, Caseworker Staub testified that they have their needs met by their resource parents in their current

___

[10] Specifically, Caseworker Staub testified that "Currently[, Mother] has provided an address.  As of December 2025, the [A]gency has attempted to go out and see the house on three separate occasions.  [Mother] has cancelled all three scheduled visits for the [A]gency to see the house."  N.T. Hearing, 12/29/25, at 13.

placements, that both children are more bonded with their foster families than their biological parents, and that it would not be detrimental to involuntarily terminate parental rights. *See id.* at 31-32.

Regarding L.W.'s placement with W.W. and his spouse (paternal grandparents), Caseworker Staub described L.W. as deeply bonded with both grandparents, turning to them for everything and treating them as parental figures. L.W. is placed alongside his sister in that home. All L.W.'s needs are met, he is medically up-to-date, and he has no ongoing medical needs following treatment for his initial injuries. The resource parents confirmed they would adopt L.W. *See id.* at 22–23.

Regarding K.K.T.'s placement with his own separate resource parents, Caseworker Staub testified that K.K.T. is thriving, bonded with the foster family and their two biological daughters, engaged in early intervention services for tracking purposes due to withdrawal symptoms at birth, and is medically up-to-date. Similarly, K.K.T's foster family confirmed they would adopt him. *See id.* at 30–31.

Afterwards, Mother testified at the termination hearing.[11] First, regarding her cooperation with the Agency, Mother acknowledged difficulty maintaining contact with the Agency but attributed that issue primarily to phone problems insofar as her phone did not work, she had to get new

---

[11] Mother attended the termination hearing remotely and arrived at 9:39 a.m., after it had begun at the scheduled time of 9:00 a.m., though her counsel attended the hearing in its entirety. *See* N.T. Hearing, 12/29/26, at 16, 25.

numbers repeatedly, and she was reluctant to share her number directly with the Agency out of fear that an associate of J.T.'s would obtain it. *See id.* at 54-55. Mother testified that she had asked her visitation provider to relay her contact information and updates to Caseworker Staub in lieu of direct contact with the Agency. *See id.* at 55. She testified that she had been in contact with Caseworker Staub as recently as the morning of the hearing and two weeks prior. *See id.* at 46, 67.

Second, as to her psychological evaluation, and the attendant recommendations, Mother testified that she completed the evaluation and believed she had complied with all of its recommendations. *See id.* at 48. However, when pressed specifically on each recommendation, her answers revealed less compliance.

On intensive therapy, Mother understood the recommendation as requiring her to see a mental health therapist, which she stated she currently sees Kenneth Sutton for individual mental health therapy once a month, a program she has been in since March 2025. *See id.* at 48–49, 60. Mother stated she was also engaged in therapy prior to that, for years, elsewhere. *See id.* at 50. Mother testified she signed releases so the Agency could verify her participation, and she gave the Agency a copy of her prescriptions as further proof. *See id.* at 51, 60. Mother expressed certainty that she had signed releases at K.K.T.'s first hearing. *See id.* at 57–58, 62–63.

As to the psychiatric consultation, Mother was uncertain whether she ever completed one. *See id.* at 64. She stated she did not know the

difference between a psychiatrist and a mental health therapist and believed they were the same thing and acknowledged she likely had not seen a psychiatrist separately. *See id.*

Regarding the NA and AA meetings, Mother testified that she attends NA and AA meetings sometimes after work when she has time but acknowledged she had never provided any documentation of attendance to the Agency. *See id.* at 64-65. Mother stated she did not know she was required to do so, believing the obligation was limited to whatever her drug and alcohol program recommended. *See id.* As to the domestic violence support groups, Mother testified this was the first time in two years she had ever heard of this requirement. *See id.* at 65. She acknowledged there was domestic violence in her relationship with J.T., but maintained she was never told she needed to attend domestic violence support groups as part of her service plan. *See id.* at 65-66.

Third, Mother confirmed she completed an evidence-based parenting program, as required. *See id.* at 53. Mother also testified that, entirely on her own initiative, she enrolled in a second parenting program approximately two to three weeks before the hearing, and that she informed Caseworker Staub via text message. *See id.* at 53-54.

Fourth, regarding her objective to maintain safe, stable, and sanitary housing, Mother testified that she currently resides at 981 Woodridge Drive, Middletown, Pennsylvania, in a house owned by her uncle, where she has lived for approximately one to two months. *See id.* at 45. The home, which has

five bedrooms and which is also inhabited by her uncle and his girlfriend, is where she intends to raise her children if they are returned to her. ***See id.*** at 45–46. Regarding the Agency's attempts to conduct a home visit, Mother testified that she invited Caseworker Staub to come see the home approximately two weeks prior to the hearing, but the visit never materialized due to scheduling conflicts because her uncle wanted to be present. ***See id.*** at 46. Mother stated she would welcome the visit as soon as it could be arranged and attributed the Agency's inability to inspect the home to scheduling difficulties, not unwillingness on her part. ***See id.*** at 46, 59–60. Further, Mother testified that prior to her current home, she lived in a hotel, paying weekly, until her uncle agreed to let her stay with him in exchange for help with bills. ***See id.*** at 59.

Fifth, regarding her objective to maintain stable employment, Mother testified that she was employed full-time at The Cleaning Authority for almost seven years and is paid weekly. ***See id.*** at 47. Mother testified that her employer emailed Caseworker Staub directly on multiple occasions to confirm her employment and work hours, particularly to facilitate her attendance at drug screens. ***See id.*** at 47–48. Mother acknowledged she did not provide pay stubs or other documentation, explained that she offered to show direct deposit records into her bank account instead, but that offer was apparently not accepted. ***See id.*** at 48.

Sixth, as to her objective of attending court hearings and Agency meetings, Mother testified that she believed she had attended all court

- 13 -

hearings she was supposed to attend. *See id.* at 66-67. Regarding the hearing she missed in order to address a warrant, she testified that Caseworker Staub advised her on the day of the hearing to take care of the warrant. *See id.* at 52, 58. Mother acknowledged that she could have handled the warrant on a different day but stated she did not know she had the warrant until that day and acted on Caseworker Staub's advice. *See id.* at 58–59. She further acknowledged that she did not consult her attorney before skipping the hearing. *See id.* at 59.

Regarding the York County warrant, Mother denied missing any York County hearings to her knowledge, describing the matter as an old case from approximately seven years ago that kept getting continued because she could not find transportation to York County. *See id.* at 66–68. Mother testified that she called the York County Public Defender's Office the morning of the hearing to address the warrant issue. *See id.* at 67. As to her absence from the early portion of the December 29, 2025 termination hearing, Mother testified that she believed that hearing was scheduled for 10:30 a.m. and apologized for appearing late from a remote location. *See id.* at 57.

As to Agency meetings, Mother testified that all of her visits with Children went well and she described the visits as "awesome always," noting that neither child displayed behavioral problems during visits. *See id.* at 52–53. Mother testified she has not missed a single visit and continues to see L.W. every other Monday and K.K.T. every other Wednesday. *See id.* at 53.

- 14 -

Seventh, Mother testified that her pending EWOC charges related to L.W. are scheduled for a hearing the following month and that she and her attorney believe the charges will likely be dropped. *See id.* at 56–57. Mother emphasized that K.K.T. was taken from her at the hospital based on those pending charges, which she found unjust given that the charges were not yet adjudicated. *See id.* at 56–57.

Eighth, as to her other pending criminal cases, Mother did not know why there remained an open arrest warrant. *See id.* at 60, 66-67.

Ninth, regarding her goal to sign all releases, Mother was adamant, repeatedly and emphatically, that she signed all requested releases, stating she was "a million percent sure" she did so at K.K.T.'s first hearing. *See id.* at 57–58, 62–63. Also, Mother flatly denied the Agency's claim that she refused to sign paperwork for L.W.'s birth certificate and testified she went into the Agency's office to sign the paperwork and was attempting to simultaneously obtain her own copy of that certificate, though she never obtained it. *See id.* at 68.

Tenth, Mother attributed her failure to keep the Agency consistently informed of her contact information to her phone problems and to fear of J.T. and an associate of J.T.'s obtaining her number. *See id.* at 54-55. Mother testified that she used her child services provider as an intermediary to convey updates to Caseworker Staub. *See id.* at 55.

Last, in her testimony on direct and on cross-examination, Mother did not address her goal of reimbursing Dauphin County.

Following the termination hearing, the trial court found that the Agency met its burden to show that grounds existed for termination of Mother's parental rights and that termination was in the Children's best interests. In making its determinations, the trial court found all of Mother's testimony was not credible. *See id.* at 72-73. On that same date, the trial court issued decrees terminating Mother's parental rights to the Children.

On January 27, 2026, Mother timely appealed but failed to concomitantly file a concise statement pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). This Court entered an order on February 6, 2026, directing Mother's counsel to file a Rule 1925(b) concise statement, which she filed on February 12, 2026.

Thereafter, Attorney Watson filed, in this Court, an application to withdraw[12] and an **Anders** brief. In the **Anders** brief, Attorney Watson raises the following issues on Mother's behalf:

1. Whether the [t]rial [c]ourt erred as a matter of law [in] terminating Mother's parental rights pursuant to [23] Pa.C.S. § 2511(a)(1), (2), (5), and (8), as [the Agency] failed to satisfy the statutory requirements for termination under each section.

2. Whether the [t]rial [c]ourt erred as a matter of law [in] terminating Mother's parental rights pursuant to [23] Pa.C.S. § 2511(b), as insufficient evidence was presented to indicate termination was in the best interest of the child.

---

[12] On July 17, 2026, we struck counsel's application to withdraw because the application incorrectly referenced a non-party and unrelated trial court docket and failed to reference Mother and the appropriate trial court dockets. We permitted counsel to refile and serve a corrected application within ten days from the entry of our order, and counsel complied.

***Anders*** Brief at 4.

When counsel seeks to withdraw pursuant to ***Anders*** and its progeny, this Court may not reach the appeal's merits prior to addressing counsel's request to withdraw. ***See In re Adoption of M.C.F.***, 230 A.3d 1217, 1219 (Pa. Super. 2020).

In ***In re V.E.***, our Court explained the standard for withdrawal from an appeal from an involuntary termination of parental rights:

> [C]ounsel appointed to represent an indigent parent on a first appeal from a decree involuntarily terminating his or her parental rights, may, after a conscientious and thorough review of the record, petition this [C]ourt for leave to withdraw representation if he or she can find no issues of arguable merit on which to base the appeal. Given the less stringent standard of proof required and the quasi-adversarial nature of a termination proceeding in which a parent is not guaranteed the same procedural and evidentiary rights as a criminal defendant, [this Court] hold[s] that appointed counsel seeking to withdraw representation must submit an *advocate's* brief, as contemplated in ***Anders***[.]

***Id.*** at 1275 (emphasis in original). Moreover, we have held that "any motion to withdraw representation, submitted by appointed counsel, must be accompanied by an *advocate's brief*, and not the *amicus curiae* brief delineated in ***McClendon***." ***Id.*** (emphasis in original).

To withdraw, counsel must:

> (1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; (2) furnish a copy of the [***Anders***] brief to the [appellant]; and (3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citations omitted).

With respect to the third **Anders** requirement, that counsel inform the appellant of her rights considering counsel's attempt to withdraw, this Court has held that counsel must "attach to [counsel's] petition to withdraw a copy of the letter sent to [the] client advising [the client] of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005). An **Anders** brief must also comply with the following requirements:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009). Last, this Court shall "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." *Commonwealth v. Flowers*, 113 A.3d 1246, 1250 (Pa. Super. 2015) (footnote omitted).

Here, our review of Attorney Watson's **Anders** brief and application to withdraw reveals that counsel has complied with each of the technical requirements of **Anders** and **Santiago**. Attorney Watson explained that she conducted an examination of the record, determined that a direct appeal

would be frivolous, and furnished a copy of the letter sent to Mother advising her of her right to proceed *pro se* or raise issues in response to the brief. **See Cartrette**, 83 A.3d at 1032. Additionally, Attorney Watson's **Anders** brief complies with the requirements of **Santiago**. **See Santiago**, 978 A.2d at 361. Therefore, we find that Attorney Watson has complied with the requirements for withdrawing from representation and we shall independently review the merits of this appeal. **See Flowers**, 113 A.3d at 1250.

Mother's first issue on appeal challenges the court's termination of her parental rights, which the court terminated pursuant to Section 2511(a)(1), (2), (5), and (8).

Our standard of review of a decree terminating parental rights is well settled:

> When reviewing an appeal from a decree terminating parental rights, [appellate courts] are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

**In re Adoption of S.P.**, 47 A.3d 817, 821 (Pa. 2012) (citations omitted). Further, the agency bears the burden of establishing grounds for termination by clear and convincing evidence. **See id.** at 821-22. Moreover, finding an abuse of discretion requires "a demonstration of manifest unreasonableness,

- 19 -

partiality, prejudice, bias, or ill-will." *Id.* at 826. "If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even though the record could support an opposite result." *Id.* at 822 (citation and quotation marks omitted).

We have previously explained the bifurcated nature of the Section 2511 analysis as follows:

> The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses on the child's needs and welfare. To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence.

*In the Int. of R.S.A.D.*, 341 A.3d 787, 795 (Pa. Super. 2025) (citations omitted).

We need only agree with the court's termination decision pursuant to any one subsection of Section 2511(a), along with Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we will focus our review on Section 2511(a)(2) and (b), which provide as follows:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> \* \* \*

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for

his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*     \*     \*

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To establish grounds for termination pursuant to Section 2511(a)(2), "the petitioner for involuntary termination must prove[:] (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and quotation marks omitted). In explaining how to analyze these elements, we have observed that courts are not limited to considering affirmative misconduct, ***see id.***, and should instead focus on the child, as follows:

> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being.

- 21 -

Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

Thus, while sincere efforts to perform parental duties, can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

Moreover, a court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child.

*Id.* at 1117-18 (citations, quotation marks, and emphasis omitted); *see id.* 1118 (stating "when a parent has demonstrated a continued inability to conduct [her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified"). "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, [her parental] rights may be forfeited." *In re E.A.P.*, 944 A.2d 79, 83 (Pa. Super. 2008) (citation and quotation marks omitted).

After our review, we conclude that there was clear and convincing evidence to support termination of Mother's parental rights to Children pursuant to Section 2511(a)(2). *See* 23 Pa.C.S. § 2511(a)(2); *S.P.*, 47 A.3d at 821; *B.L.W.*, 843 A.2d at 384. The Agency established by clear and

convincing evidence that Mother's repeated and continued incapacity caused Children to be without essential parental care, control, and subsistence, and the causes of Mother's incapacity will not be remedied. *See Z.P.*, 994 A.2d at 1117. At the time of the termination hearing, L.W. was in Agency care for nearly two years and K.K.T. in care for nine months and since birth. As to Mother's incapacity, Caseworker Staub testified that, throughout the life of Children's cases, Mother was noncompliant with her case plan objectives and was largely uncooperative with the Agency. Importantly, and most strikingly, Caseworker Staub indicated that Mother: (1) was inconsistent in her compliance with maintaining stable housing, including for months at a time and in the months immediately prior to the termination hearing, which Mother admitted; (2) failed to communicate with the Agency or Children's foster families for several months immediately prior to the termination hearing, which Mother largely admitted; (3) failed to attend various court hearings and the majority of agency meetings; (4) had reduced contact with Children in the months prior to termination, reduced down to one visit every two weeks; and (5) continued to have active criminal cases at the time of the termination hearing, which included other cases in addition to the EWOC charge connected to L.W. In the end, although Mother claims to have recently secured what she considers to be appropriate housing with her uncle, the Agency was not able to conduct a site visit to confirm its appropriateness for Children, and the trial court found Mother to be wholly incredible in her testimony. We find no abuse

of discretion or error of law in the termination of Mother's parental rights to Children under these circumstances.

Next, we turn our attention to Section 2511(b), where the court's "primary consideration [is] the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). In considering Subsection 2511(b), we have explained that the focus is on the child rather than the parent, as follows:

> Courts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, i.e., specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the child is in a pre-adoptive home and whether the child has a bond with the foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*R.S.A.D.*, 341 A.3d at 797-98 (citation and brackets omitted).

"Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006). Also, when evaluating the nature of the parent-child bond, "whether termination would destroy an existing, necessary

and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *Z.P.*, 994 A.2d at 1121 (citations omitted).

Here, the trial court conducted its Section 2511(b) analysis as follows:

In the instant case, the best interests of the Children were clearly served by terminating Mother's parental rights and ordering that the Children remain in the custody of the Agency and their respective foster families.

The record provides no evidence to suggest that a healthy bond exists between Mother and either of the Children. Mother has not seen L.W. on a regular basis since January of 2024, when L.W. was only [nine] months old and he was placed into foster care.

And Mother has never seen K.T. on a regular basis, since K.T. was placed into his current foster home [less than a week] after he was born. Since January 2024, Mother's interactions with the Children have been extremely limited due to her propensity for failing to show for scheduled visits or cancelling scheduled visits at the last minute. Based on her personal observations, Caseworker Staub testified that the Children view their respective foster parents as their actual parents, which is unsurprising considering Mother's continued absence from their life.

It is clear that the Children's current foster homes are the most conducive to their love, comfort, security[,] and stability, as well as their developmental, physical[,] and emotional needs. Mother has not presented evidence to establish that she can provide the love, comfort, security[,] and stability that is currently being provided to the Children in their foster home[s]. Mother's inability to find stable housing, her refusal to cooperate responsibly and coordinate with the Agency for the benefit of the Children, her repeated failure to present herself for scheduled court proceedings and visits with her children, and her continued relationship with a Megan's Law offender shows tremendous lack of judgment on Mother's part and raises substantial concern about her ability to sufficiently tend to the developmental, physical[,] and emotional needs and welfare of the [Children.]

L.W. has been living in a kinship foster placement with his paternal grandparents since January 2024 when L.W. was about [eight] or [nine] months old. Caseworker Staub has observed L.W. in [L.W.'s] paternal grandparents['] home and recounted that L.W. has great interactions with [his] paternal grandparents and looks to them as if they are his parents.

L.W.'s sister, who is just one year older than him[,] also has been placed with the paternal grandparents, and he interacts well with his sister. [L.W.'s p]aternal grandparents have ensured that L.W. is enrolled in age-appropriate activities, that he is medically up to date and has no need for ongoing medical treatment, and they have ensured that all his needs are met.

[K.K.T.] was placed in his foster home with [J.E. and A.E., his foster parents,] when he was only [several] days old, and, therefore, this is the only home he has known all his life. Based on her observations, Caseworker Staub testified that [K.K.T.]'s interactions with [his foster parents] have been very positive and she has no concerns with his placement there. [K.K.T.'s foster parents] also have two biological children with whom [K.K.T.] interacts well. [Caseworker] Staub testified that [K.K.T.'s foster parents] meet all [K.K.T.]'s needs, make sure he is medically up to date, and treat him as if he is one of their biological children.

Considering the foregoing, [the trial court is] convinced that removal of the Children from the only stable and loving homes they have known over the last two years would be harmful to their emotional and physical well-being.

Trial Court Opinion, 2/23/26, at 24-25.

After our review, we find the trial court's determinations to be supported by the record and we find no abuse of discretion or error of law. Caseworker Staub's testimony established by clear and convincing evidence that termination of Mother's parental rights to Children serves Children's best interests. *See Z.P.*, 994 A.2d at 1121; *see also* N.T. Hearing, 12/29/25, at 31-32 (Caseworker Staub testifying that Children are more bonded with their foster families than Mother and that it would not be detrimental to

involuntarily terminate Mother's parental rights). Indeed, the foster parents for each child testified that, in the months and years in which they cared for their respective child, the families have provided loving and supportive homes, which included nurturing relationships with other similarly aged siblings, and the foster families intended to adopt Children. *See id.* at 39-41 (W.W. testifying that L.W. has been in his foster care for nearly two years, L.W. has positive relationship with his sister who is also in W.W.'s care, and W.W. intends to adopt L.W.); *see also id.* at 41-43 (J.E. testifying to accepting K.K.T. into her foster home mere days after birth, K.K.T. has positive relationships with foster siblings, and J.E. and A.E. intend to adopt K.K.T.). Accordingly, we conclude that Mother is not entitled to relief on her second and final issue.

In conclusion, the claims raised in the *Anders* brief lack merit and our independent review of the record reveals no other issues of arguable merit that Mother could have raised. *See Flowers*, 113 A.3d at 1250. We agree with counsel that this appeal merits no relief; thus, we affirm the decrees terminating Mother's parental rights to Children.

Decrees affirmed. Counsel's petition to withdraw is granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 08/13/2026